# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 5, 2026

Lyle W. Cayce
Clerk

No. 25-30524

———————————

Bret Bodin; Brad Newell; Darian Morgan; Michael Rosas; Mid-City Mike Rentals, L.L.C.; Airbnb, Incorporated,

*Plaintiffs—Appellants*,

*versus*

New Orleans City,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:25-CV-329

———————————————————————

Before Wiener, Haynes, and Graves, *Circuit Judges*.

James E. Graves, Jr., *Circuit Judge*:

Over the last decade, New Orleans has legislated to mitigate the harmful effects of short-term rentals on its residents, which has prompted several constitutional lawsuits. A challenge to the City's short-term rental (e.g., Airbnb) licensing scheme has once again reached this court. Prospective short-term rental hosts and Airbnb now challenge two ordinances. One limits short-term rental licenses to one property per block,

No. 25-30524

and the other directly regulates short-term rental platforms to prevent them from processing transactions on unlicensed rentals. We uphold both.

## I. Background

"With the advent of online platforms like Airbnb and Vrbo, short-term rentals in cities . . . across the country have become ubiquitous." *Hignell-Stark v. City of New Orleans* ("*Hignell-Stark II*"), 154 F.4th 345, 351 (5th Cir. 2025). Before their rise, New Orleans banned "property owners in residential neighborhoods from renting their homes for less than thirty days." *Hignell-Stark v. City of New Orleans* ("*Hignell-Stark I*"), 46 F.4th 317, 321 (5th Cir. 2022). The City partially lifted this ban in 2017 and introduced a short-term rental licensing regime. *Id.*

The new regime resulted in a rise in short-term rentals, and a corresponding fall in residents' quality of life. *Hignell-Stark II*, 154 F.4th at 351. A 2019 study revealed that short-term renters "cared little about the surrounding residential community." *Id.* They "were loud, created trash, and threw parties." *Id.* Without permanent residents, "neighborhood character" eroded. *Id.* And some evidence suggested that the short-term rental market "reduced . . . affordable housing." *Id.*

The City responded by restricting short-term rental licenses. *Hignell-Stark I*, 46 F.4th at 321. Property owners and rental platforms responded by challenging the City's short-term rental restrictions in federal court—with partial success. *Hignell-Stark II*, 154 F.4th at 351. Our court sustained a Commerce Clause challenge to a 2019 ordinance that required a short-term rental operator to be the primary resident of the property. *Hignell-Stark I*, 46 F.4th at 321, 326–29. When the City revised the ordinance to prevent businesses from owning short-term rentals, we held that the revision violated the Equal Protection Clause. *Hignell-Stark II*, 154 F.4th at 354–58.

No. 25-30524

New Orleans residential property owners (the Hosts) and Airbnb now challenge two ordinances: the 2023 Ordinance and the 2024 Ordinance. The 2023 Ordinance limits short-term rental licenses to one property per residential block, with licenses distributed by lottery. Comprehensive Zoning Ordinance of the City of New Orleans ("CZO") § 21.8.C.18(m); New Orleans City Code ("City Code") § 26-617(g). The 2024 Ordinance prohibits short-term rental platforms from facilitating a transaction on an unlicensed rental; and requires them to verify a rental's license status before facilitating a transaction, and to reverify this status every 30 days after the transaction, or if they "know[] or should know that any data it used to complete the most recent verification has changed." City Code § 26-622(a).

The Hosts and Airbnb sued to challenge both ordinances, alleging that they violate various constitutional and statutory rights. *Bodin v. City of New Orleans*, 804 F. Supp. 3d 669, 694 (E.D. La. 2025). The district court dismissed all of plaintiffs' claims under Rule 12(b)(6), except for Airbnb's claim that the 2024 Ordinance's monthly reporting requirement violates the Fourth Amendment. *Id.* at 702. On this claim, it granted Airbnb summary judgment. *Id.* Airbnb appeals dismissal of its other claims. **ECF 1, 1.**[1]

## II. Discussion

### A. The 2023 Ordinance does not violate the Takings Clause.

The Hosts challenge the 2023 Ordinance. It limits short-term rental licenses to one property per residential block, to be distributed by lottery. CZO § 21.8.C.18(m). But in the French Quarter, if a bed and breakfast operates on a block, the City will not issue a license for that block. CZO

---

[1] We review a dismissal for failure to state a claim de novo. *McKay v. LaCroix*, 117 F.4th 741, 746 (5th Cir. 2024).

§ 21.8.C.18(q). The 2023 Ordinance also prohibits any person from operating more than one short-term rental. *Id.* § 21.8.C.18(i).

The Hosts maintain that the 2023 Ordinance violates the Takings Clause, which prohibits the government from taking private property without "just compensation." *Armstrong v. United States*, 364 U.S. 40, 48–49 (1960). Two kinds of taking are compensable: per se and regulatory takings. *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 274 (2024). The Hosts rely on both theories. We reject each.

### 1. The 2023 Ordinance does not effect a per se taking.

The Hosts argue that because the 2023 Ordinance interferes with their "fundamental right" to lease, it effects a per se taking. This theory rests on a reimagined per se taking test: that the government effects a per se taking whenever it interferes with any fundamental property right. That is the wrong test. Instead, government action triggers per se protection only if it "physically appropriate[s] property or otherwise interfere[s] with the owner's right to exclude others from it." *Sheetz*, 601 U.S. at 274 (citation modified). Only then is compensation mandatory without balancing other factors. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).

We reject the Hosts' reimagining of the per se taking test for two reasons:

First, the Hosts' fundamental-right test relies on quoted language they deprive of critical context. They assure us that the Supreme Court has "made clear [that] per se takings . . . occur whenever government appropriates 'a fundamental element of the property right,' *Cedar Point*, 594 U.S. at 149–50, or 'otherwise interferes' with such a right, *Sheetz*[,] 601 U.S. [at] 274." **Gray Br. at 4 (citation modified).** Neither *Cedar Point* nor *Sheetz* make this clear. The only right that *Cedar Point* refers to is "the right to exclude." 594 U.S. at 149–50. And in context, the *Sheetz* quote should read,

"or otherwise interfere[s] with the owner's right to exclude." 601 U.S. at 274. All that both cases make clear is that the per se taking test protects against physical invasions and interference with a single fundamental right: the right to exclude. *See id.*; *Cedar Point*, 594 U.S. at 149–50. Hence, the Hosts' per se taking test finds little support in the cases they invoke to announce it.

Second, *Tyler v. Hennepin County* does not justify the Hosts' resort to myriad treatises, ancient state cases, and law review articles to redefine a per se taking. 598 U.S. 631 (2023). True, we may look beyond binding precedent to "traditional property law principles [and] historical practice," for our per se taking analysis. *Id.* at 638. In *Tyler*, the Supreme Court examined these sources to recognize "the principle that a taxpayer" has a protected property interest in "the surplus in excess of the [tax] debt owed" on their property. *Id.* at 642–43. So the government could not use a small tax lien to seize an entire property's value without compensating the owner for the surplus. *Id.* at 642–45.

Yet *Tyler* allows us to rely on traditional and historical sources only when it is unclear whether the Takings Clause protects a certain type of property. *See id.* In *Tyler*, there was no question that the entire property had been appropriated—a classic per se taking candidate. *See id.* But the question was "whether [the] remaining value [was] property under the Takings Clause." *Id.* at 638. Traditional and historical sources said yes. *See id.* at 642–56. Here though, the Takings Clause inarguably protects the Hosts' residential property. *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421–41 (1982). The question is whether the 2023 Ordinance takes that property, which we answer with a simple test and without input from the Hosts' self-serving tour of property doctrine.

Nor do we accept the Hosts' claim that the ability to *include* enjoys the same Takings Clause protection as the right to *exclude*. The right to exclude is "one of the most treasured" property rights. *Cedar Point*, 594 U.S. at 149 (citation modified). It enjoys particular Takings Clause protection because its infringement is equivalent to a physical invasion. *See id.* at 149–52. Yet the Hosts invoke the ability to include others, which has nothing to do with a physical invasion. And the Hosts offer no authority—except a footnote in a law review article—that has ever suggested that it does. We thus reject the Hosts' attempt to treat the ability to include short-term rental guests as equivalent to the treasured right to exclude.

After rejecting the Hosts' faulty premises, their per se taking theory collapses. Even if there was a fundamental right to short-term lease, that does not inform whether the 2023 Ordinance physically appropriates the Hosts' property or interferes with their right to *exclude* others from it—the only proper test. *See Sheetz*, 601 U.S. at 274. Because the ordinance does neither, it does not effect a per se taking.

### *2. The 2023 Ordinance does not effect a regulatory taking.*

The Hosts' regulatory taking theory fails too. The government has broad latitude to regulate "property rights in ways that may adversely affect the owner[]." *Hodel v. Irving*, 481 U.S. 704, 713 (1987). But a regulation can still effect a taking if it "goes too far." *Id.* at 718 (citation omitted). We call this a "regulatory taking." *Cedar Point*, 594 U.S. at 149. To analyze regulations, we weigh the *Penn Central* factors: (1) the economic impact on the property owner, (2) how much the regulation interferes with reasonable "investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978). We balance these factors "to identify regulatory actions that are

functionally equivalent to" a per se taking. *Legacy Hous. Corp. v. City of Horseshoe Bay*, 158 F.4th 636, 643 (5th Cir. 2025).

The district court held, and the City does not contest, that the first two *Penn Central* factors favor the Hosts. *Bodin*, 804 F. Supp. 3d at 685. We assume—without deciding—that this was correct. But to balance all three factors, we must still consider what weight to give the first two. *See AbbVie, Inc. v. Fitch*, 152 F.4th 635, 644 (5th Cir. 2025) (per curiam). Because the first two factors weigh only slightly in the Hosts' favor, the third factor is dispositive—and defeats the Hosts' regulatory taking theory.

The Hosts claim that the 2023 Ordinance has an economic impact through diminished rental income. But "the mere fact that [a] regulation" extinguishes a property's "most profitable use" does not "necessarily" show a taking. *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168 (1958). Indeed, "loss of future profits . . . provides a slender reed upon which to rest a takings claim." *Andrus v. Allard*, 444 U.S. 51, 66 (1979). We are skeptical that we may consider lost profits at all. *See Legacy Hous.*, 158 F.4th at 647. But assuming we could, the impact must be severe; not even a 25% reduction could show a regulatory taking. *Id.* (quoting *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011)).

While the Hosts have allegedly lost profits, that loss is not severe. The only definite figure they offer is from Michael Rosas, who lost about $20,000 per year in rental revenue. Other Hosts allege nebulous economic harm, such as being unable "to unlock the full value of their properties." Even crediting these allegations, these are trivial losses, compared to the impact that usually supports a taking. *Cf. United States v. Kan. City Life Ins. Co.*, 339 U.S. 799, 809–12 (1950) (taking: government action "destroyed the agricultural value of the respondent's land"); *United States v. Causby*, 328 U.S. 256, 259 (1946) (taking: government action "destr[oyed] . . . the use of the property as a

commercial chicken farm"). We consequently afford the first *Penn Central* factor only slight weight in the Hosts' favor.

The "investment-backed expectations" factor is similarly weak. This factor depends on the Hosts' "primary expectation concerning the use of the parcel." *Id.* Expectations are "reasonable only if they take into account the" state's power "to regulate in the public interest." *Nekrilov v. City of Jersey City*, 45 F.4th 662, 674–75 (3d Cir. 2022) (citation omitted) (ordinance restricting short-term rentals did not interfere with reasonable investor expectations).

The 2023 Ordinance may have frustrated the Hosts' ambitions to operate short-term rentals. But it did not extinguish their ability to rent entirely—they can still rent long term. And if the Hosts expected the City never to regulate residentially zoned property, that expectation was unreasonable. *See Legacy Hous.*, 158 F.4th at 646 ("Legacy should have expected reasonable new zoning restrictions . . . ."). Especially because the City lifted its total ban on short-term rentals only recently—in 2017. *See Hignell-Stark I*, 46 F.4th at 321. Hence the 2023 Ordinance's interference with *reasonable* expectations is slight.

The third *Penn Central* factor—the character of the government action—weighs in the City's favor. Our assessment of this factor depends on whether the governmental action is "a physical invasion" or an "interference [that] arises from [a] public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124. "[R]easonable land-use regulations do not work a taking." *Murr v. Wisconsin*, 582 U.S. 383, 400 (2017). So if the government enacts a "reasonable . . . zoning regulation[] . . . the third *Penn Central* factor" weighs in its favor. *Legacy Hous.*, 158 F.4th at 646.

The 2023 Ordinance is just that—a reasonable zoning regulation. The City determined "that the rapid proliferation of" short-term rentals "in residential neighborhoods had lowered residents' quality of life." *Hignell-Stark I*, 46 F.4th at 321. The City consequently amended its zoning ordinances to restrict the proliferation of short-term rentals. *See* CZO § 21.8.C.18. By any measure, this was reasonable.

The Hosts dismiss the third factor as the "least important." Perhaps. But if the first two factors are equivocal, the third may be dispositive. *See AbbVie*, 152 F.4th at 644. For example, in *AbbVie*, a state Medicaid regulation had only a "minor [economic] impact," and "d[id] not significantly interfere with reasonable . . . expectations." *Id.* Still, the regulation "furthered important public interests," which was enough for "the *Penn Central* factors [to] weigh heavily in the state's favor." *Id.*

So too here: the 2023 Ordinance has only a slight economic impact, and does not significantly interfere with the Hosts' reasonable expectations. With these factors weak, the fact that the ordinance is a reasonable zoning regulation that furthers the City's important interests is critical—and dispositive. As a result, we find that the third factor far outweighs the first two.

And we disagree with the Hosts that the City's action was so "extraordinary" that it must be a regulatory taking. Of course, an extraordinary government action may show a taking. *E.g.*, *Hodel*, 481 U.S. at 716. But this usually involves a regulation that destroys an "essential stick[]" in the bundle of [property] rights." *Id.* (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)). In *Kaiser*, this was the right to *exclude* public boats from riparian land. 444 U.S. at 166–68. In *Hodel*, this was "virtually the abrogation of the right to pass on a certain type of property . . . to one's heirs." 481 U.S. at 716. In other words, without an interference with the right

to exclude, or the complete abrogation of an essential property right, the government action is not extraordinary. *See id.*; *Kaiser*, 444 U.S. at 175–79.

The 2023 Ordinance is nowhere near as significant. It regulates the Hosts' ability to enter into certain lease lengths, and selectively lifts this burden through a lottery. *See* CZO § 21.8.C.18; City Code § 26-617(g). Again, an interference with the ability to lease does not equate to an infringement on the right to exclude. And even if there were a fundamental right to lease, the 2023 Ordinance only slightly restricts it. As a result, the ordinance lacks the extraordinary character that justified a taking in *Kaiser* and *Hodel*.

On balance, the *Penn Central* factors favor the City. The Hosts suffer only a slight economic impact and little interference with their reasonable expectations. So we afford those factors less weight. And the 2023 Ordinance's character weighs heavily in the City's favor. Hence the Hosts' regulatory-taking theory also fails, and we affirm dismissal of their Takings Clause claim.

**B. Section 230 does not preempt the 2024 Ordinance.**

*1. Section 230 preempts a law that treats a platform as the publisher or speaker of third-party content.*

Airbnb also argues that § 230 of the Communications Decency Act preempts the 2024 Ordinance. Section 230 immunizes a provider of internet services from "all claims stemming from their publication of information" by third parties. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (quoting 47 U.S.C. § 230(c)(1)). This immunity applies whenever "(1) the provider or user of an interactive computer service [is] (2) treated as the publisher or speaker of third-party content." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 792–93 (5th Cir. 2024). Section 230 explicitly preempts any inconsistent state law. *See* 47 U.S.C. § 230(e)(3).

The second prong, the publisher-or-speaker inquiry, depends on whether a law imposes a duty that "derives from [the platform's] status as a publisher or speaker or requires the exercise of functions traditionally associated with publication." *Salesforce*, 123 F.4th at 793. This refers to a duty that "necessarily require[s] [a provider] to monitor, alter, or remove third-party content." *Id.* at 795 (citation modified). Section 230 preempts a law when it imposes a duty to perform these functions, "or else face liability." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 742 (9th Cir. 2024) (citation omitted); *see Salesforce*, 123 F.4th at 795.

Airbnb complains that two provisions of the 2024 Ordinance treat it as a publisher or speaker of third-party content: the "booking requirement" and the "verification requirement." Neither does.

### 2. The booking requirement does not treat Airbnb as a publisher or speaker.

The booking requirement prohibits a platform from collecting a fee in exchange for "conducting, facilitating or completing" a booking transaction for a rental that does not comply with the City's short-term rental licensing requirements. City Code § 26-622(a)(1). But a duty not to profit from unlawful activity is not a publication function. *See Salesforce*, 123 F.4th at 798 ("Polic[ing] the use of [the platform's own] products . . . is not . . . quintessentially" a publication function.). Nor does the booking requirement *necessarily* impose a duty to monitor, alter, or remove third-party content. *See id.* at 793. Hence, the booking requirement does not treat Airbnb as a publisher or speaker.

Airbnb counters that our "functional" approach to § 230 immunity requires us to consider that its "only option" to respond to the booking requirement "is to delete [a noncompliant listing] or change its content." We disagree.

No doubt, our approach is functional; we look beyond a duty's label to examine what kinds of decisions would result in liability. *See Salesforce*, 123 F.4th at 793 (quoting *MySpace*, 528 F.3d at 420). This prevents "artful pleading" (or drafting) to avoid § 230 protection. *See MySpace*, 528 F.3d at 419 (citation omitted). If a law functionally holds a platform liable for the decision whether to monitor, screen, and delete content, it treats the platform as a publisher or speaker of that content—even if it does not invoke these terms. *See Salesforce*, 123 F.4th at 793–94. Yet we ask only what the duty "necessarily require[s]," not how a platform might respond. *See id.* at 795. In other words, our functional approach depends only on what the law requires "[o]n its face." *See HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 n.3 (9th Cir. 2019).

The Ninth Circuit in *HomeAway.com* used a similar approach to reject a nearly identical argument to Airbnb's here. *Id.* at 682–84. There, several platforms claimed that a similar ordinance would "force[] them to remove third-party content." *Id.* at 683 (citation modified). But the ordinance, "on its face," did not require a platform to perform a publication function, so it did not treat them as a publisher or speaker. *See id.* Although Airbnb claims otherwise, the Ninth Circuit's approach is entirely consonant with our functional approach: it considers whether liability results from "conduct [that] necessarily involves treating the liable party as a publisher of the content it failed to remove." *See Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016) (citation modified). So do we.

On its face, the booking requirement leaves Airbnb free to host "as many unlawful [short-term rental] listings on its website as it chooses to." *Bodin*, 804 F. Supp. 3d at 700. How many listings it chooses to remove, if any, falls to business judgment—not legal duty. What matters is that the requirement does not necessarily hold Airbnb liable for a decision whether to monitor, screen, or delete content. *See Salesforce*, 123 F.4th at 795. As a

result, the booking requirement does not treat Airbnb as a publisher or speaker, and it survives § 230 scrutiny.

### 3. The verification requirement does not force Airbnb to monitor § 230 protected content.

Superficially, the verification requirement seems a better preemption candidate. Under it, a platform must "verify the legal eligibility of each booking transaction [it] facilitate[s] through the city's electronic verification system," and once it facilitates a transaction, the platform must reverify that a listing is eligible at least every thirty days. City Code § 26-622(a)(4). Airbnb claims that the verification requirement asks it to perform a publication function, because it must monitor information.

Yet § 230 does not immunize a platform "against all claims derived from third-party content." *Salesforce*, 123 F.4th at 795 (citation modified). It aims instead "to protect a provider from speaker-liability stemming from the speech it hosts." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *aff'd* 606 U.S. 461 (2025). This is why information that is "distinct, internal, and nonpublic" is not third-party content under § 230—even if it would not exist "but for" third-party content. *See HomeAway.com*, 918 F.3d at 682–83; *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009) ("[T]o provide immunity every time a website uses data initially obtained from third parties would eviscerate [§ 230].").

Airbnb insists that it can only comply with its verification duties by reviewing the content of the public rental listings. Granted, the listings' content is third-party speech, so any required monitoring might trigger § 230. *See, e.g.*, *Salesforce*, 123 F.4th at 795. But Airbnb conveniently omits a provision that allows it to comply with its verification duties without monitoring third-party content: Short-term rental hosts must submit detailed license information "to the platform for the listing to be verified through"

the City's verification system. *See* CZO § 26-622(a)(5). Crucially, there is no requirement that a host publish their license status on their rental listing. *See generally id.* § 26-622.

With these "distinct, internal, and nonpublic" disclosures, Airbnb may comply with the verification requirement without monitoring the listings. Although the disclosures result from the listings, that is never enough to trigger § 230. *See Salesforce*, 123 F.4th at 795. Hence § 230 does not preempt the verification requirement. Because the booking requirement survives § 230 scrutiny as well, we affirm dismissal of Airbnb's § 230 preemption claim.

*    *    *

For these reasons, we AFFIRM the district court's dismissal of the Hosts' Takings Clause claim and Airbnb's § 230 claim.[2]

---

[2] The Hosts and Airbnb level cursory arguments against the dismissal of their other claims. We have reviewed the district court order, the complaint, and the relevant briefing on these issues. Seeing no error, we affirm dismissal of the other dismissed claims.